# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| THERESA NORRIS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Case number 1:12cv0216 TCM |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Theresa Norris for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Ms. Norris (Plaintiff) applied for SSI in July 2010, alleging she was disabled as of August 6, 2008, because of post-traumatic stress disorder (PTSD), anxiety, panic attacks, depression, Marfan syndrome,[1] chronic obstructive pulmonary disease (COPD), bipolar

---

[1] "Marfan syndrome is a genetic disorder that affects the body's connective tissue." The Marfan Foundation, What is Marfan Syndrome, http://www.marfan.org/about/marfan (last visited Mar. 17, 2014). The syndrome can affect many different parts of the body, including the heart, bones, blood vessels, joints, eyes, lungs, skin, and nervous system. Id.

disorder, emphysema, and insomnia. (R.[2] at 121-27, 148.) Her application was denied initially and following an August 2011 hearing before Administrative Law Judge (ALJ) Christina Young Mein. (Id. at 7-21, 26-51, 55, 63-67.) After reviewing additional evidence, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff, fifty-one years old at the time of the hearing, testified she is 5 feet 10 inches tall, weighs 182 pounds, is divorced, and lives with her mother. (Id. at 32.) She graduated from high school and completed a one-year course at a business college. (Id. at 33.) She receives food stamps and is on Medicaid. (Id. at 34.) Her driver's license has been suspended for non-payment of tickets. (Id. at 33.)

Plaintiff has not worked since 2006. (Id. at 35.) She tried to get a housekeeping job in the little town where she lives although she knew she not could stand on her feet all day. (Id. at 36.) She was not hired. (Id.)

Plaintiff explained that she cannot work because she cannot stand on her feet for very long; she has Marfan syndrome, which affects her eyes, lungs, ligaments, heart, and

---

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

"something else"; she has a bad heart, for which she must carry nitroglycerin; and she sees a psychiatrist and therapist.  (Id. at 37-38.)

Plaintiff does not have any side effects from her medications.  (Id. at 39.)

She does not belong to any clubs or other organizations and does not attend church or other meetings.  (Id. at 39-40.)  The only places she goes are to her brother's house and her best friend's house.  (Id. at 40.)  She spends most of her day watching television.  (Id.)  She reads at night and, very seldom, plays Solitaire on her mother's computer.  (Id. at 40-41.)  She smokes, but is trying to stop.  (Id. at 41.)  She lasted used methamphetamine twelve years ago.  (Id.)  She has not smoked marijuana for two or three months.  (Id. at 41-42.)

Plaintiff can dress herself.  (Id. at 42.)  She is not a very good cook; the brother who lives with them does the cooking.  (Id.)  She rarely goes grocery shopping because she "hate[s]" it.  (Id.)  She sits on a stool to wash the dishes, and she helps do the laundry.  (Id. at 42, 45.)  She does not vacuum because she is not supposed to lift anything due to her heart condition.  (Id. at 43.)  On a typical day, she checks on her outdoor cactus, has a cup of coffee, watches the news, makes her bed, and watches a soap opera.  (Id. at 44.)  She is easily distracted when doing chores.  (Id. at 45.)  She has memory problems and often has panic attacks and anxiety attacks.  (Id. at 45-46.)  Daily, she wants to shut herself in her room.  (Id. at 47.)  She has mood swings.  (Id.)  She seldom gets as much as two hours of sleep a night.  (Id. at 48.)  She cannot stand for longer than ten minutes.  (Id.)  She can lift a gallon of milk.  (Id.)

At the conclusion of Plaintiff's testimony, the ALJ elected not to ask any questions of Alissa A. Smith, M.S., C.R.C., who was present to testify as a vocational expert (VE). Instead, the ALJ decided to submit interrogatories to her, if necessary, after the consulting examiner's report was received.

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and assessments of her physical and mental functional capacities.

When applying for SSI, Plaintiff completed a Disability Report. (Id. at 147-56.) She reported that she had stopped working on December 1, 2005, because she could not afford the gas to drive to her job. (Id. at 148.) Her impairments prevented her from working as of August 6, 2008. (Id.)

On a Function Report, Plaintiff explained that she has insomnia, causing her to lie in bed at night and wait for morning. (Id. at 181.) She has temporary custody of her grandson and, consequently, receives food stamps for him. (Id. at 182.) When he leaves, she will lose Medicaid. (Id.) She does all the household chores, except repairs, mowing, and vacuuming. (Id. at 183, 184.) It usually takes her all day. (Id. at 183.) She and her grandson play concentration (a card game) and build blocks. (Id. at 185.) Occasionally, she goes swimming in the river with her friend, goes to yard sales, and visits with family. (Id.) She has problems getting along with other people because she gets on their nerves, can talk too much or get mad, and, sometimes, says mean things. (Id. at 186.) Her impairments adversely affect her

abilities to lift, stand, talk, climb stairs, remember, follow instructions, concentrate, understand, get along with others, and complete tasks. (Id.) She can follow written instructions "pretty well," but not spoken instructions. (Id.) She does not handle stress well, but does handle changes in routine "pretty good." (Id. at 187.) She is afraid of being in public because people might think there is something wrong with her. (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications. (Id. at 200-06.) Since she filed the original report, her impairments and their limitations have not changed for the better or the worse. (Id. at 200.) She has new impairments, but did not, as requested, list them. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin on June 13, 2008, when Plaintiff was seen at Swope Health Services (Swope) for an evaluation of her depression, anxiety, and recurring thoughts of abuse. (Id. at 266-77.) She was not sleeping well, was having trouble concentrating, and was having panic attacks. (Id. at 266-67.) She had been having these psychiatric symptoms since she was twelve years old. (Id. at 267.) She reported that she had never gotten over the loss of her stepfather when she was fourteen years old and had just ended a six-year relationship, during which she had been abused. (Id. at 267, 268.) She worried about taking care of her daughter and grandson. (Id.) She had no employment history. (Id. at 268.) She had used marijuana and methamphetamine, but had stopped seven years earlier. (Id. at 270.) She was not taking any medications. (Id. at 272.) Her bones hurt and she had low blood pressure. (Id.) On a mental status rating scale, she was assessed as being extremely severe in anxiety, depression, guilt

feelings, and tension.  (Id. at 274.)  She was moderately severe in suspiciousness and distractibility.  (Id.)  She was diagnosed with major depressive disorder, recurrent severe without psychosis, panic disorder without agoraphobia, and PTSD.  (Id. at 276.)  Her current Global Assessment of Functioning (GAF) was 35.[3]  (Id.)

Two weeks later, Plaintiff was seen at Swope for physical complaints of insomnia and blepharitis (inflammation) on her eyelid.  (Id. at 282-83.)  She explained that she had been awake for sixty-two hours.  (Id. at 282.)  She reported that she had had a nervous breakdown, but did not say when, and denied any suicidal ideation.  (Id.)  She was diagnosed with COPD, insomnia, and blepthatitis, and was prescribed medications for each.  (Id. at 283.)  She was to return in two weeks.  (Id.)

Plaintiff returned to Swope on July 25.  (Id. at 304-05.)  She was described as twitching and upset, and was referred to Behavioral Health.  (Id.)

Plaintiff was admitted to the Research Medical Center in Kansas City, Missouri, on August 6 with spontaneous pneumothorax (collapsed lung).  (Id. at 226-61.)  It was noted she continued to smoke.  (Id. at 234.)  It was also noted that she had "been able to be moderately active all her life."  (Id.)  Plaintiff was diagnosed with dyspnea, right recurrent pneumothorax, COPD, Marfan syndrome, and tobacco habituation.  (Id. at 237.)  She was

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV-TR at 34 (emphasis omitted).

advised to quit smoking.  (Id.)  She elected to undergo a thoracoscopy and thoractomy to eliminate the source of the pneumothorax and to prevent any recurrence.  (Id. at 228.)  While hospitalized, she was seen by a psychiatrist, Thomas E. Hafer, M.D.  (Id. at 230-31.)  He noted that she had "[s]ignificant problems with low moods, negativity, low esteem, etc., also anhedonia."  (Id. at 230.)  He described her as having "a very reactive mood to severe stresses."  (Id.)  He questioned whether there was substance misuse, but Plaintiff denied such. (Id.)  She also had "significant insomnia and decreased appetite."  (Id.)  He diagnosed Plaintiff with delirium, not otherwise specified (NOS), and depression, NOS.  (Id. at 231.)  Her GAF was 40.  (Id.)  She was to be treated with Remeron for her mood and anxiety issues. (Id.)  An echocardiogram showed satisfactory systolic left ventricular function with normal chamber dimensions and an ejection fraction of 0.6; no significant pericardial effusion; normal left atrial dimensions; and mild aortic and tricuspid regurgitation.  (Id. at 232, 238-39.)  At discharge on August 16, she was prescribed Advair, Darvocet, Albuterol inhalers, Nicoderm patches, and Zoloft.  (Id. at 226.)  Her discharge diagnoses were recurrent spontaneous pneumothorax, history of Marfan syndrome with two previous spontaneous pneumothraces, and depression.  (Id.)  A chest x-ray taken the day of discharge showed subsegmental atelectasis in the right mid and upper lung fields and right pleural thickening. (Id. at 243.)

Two days after her discharge, she was seen by a family nurse practitioner at Swope and was prescribed tramadol for her chest pain, ibuprofen, and Albuterol for her COPD.  (Id. at 302-03.)

Plaintiff was seen by Mark Cannon, M.D., at Swope on September 5 for her complaints of sadness, loss of interest, difficulties concentrating and sleeping, high anxiety, nervousness, hypervigilance, and fluctuating appetite. (Id. at 284.) She reported that she had had a psychiatric hospitalization ten years earlier. (Id.) On examination, her hygiene, grooming, eye contact, and insight and judgment were all good. (Id.) Her mood was depressed; her affect was anxious; and her speech was soft and slow. (Id.) The diagnosis was major depression, recurrent, rule out PTSD.[4] (Id.) Her GAF was 50.[5] (Id.) She was started on an antidepressant, Lexapro, to be taken daily; on anxiolytic alprazolam, for anxiety, to be taken twice daily as needed; and on Ambien, for insomnia. (Id.) She was to return in six weeks. (Id.)

Plaintiff reported to Dr. Cannon on October 28 that she was continuing to struggle with dysphoria, loss of interest, and withdrawal. (Id. at 309.) The alprazolam and Ambien were helping with her anxiety and insomnia. (Id.) Cymbalta was prescribed in place of Lexapro. (Id.) Her diagnoses were the same. (Id.)

Plaintiff saw Dr. Cannon again on December 9, reporting that she was doing well overall. (Id. at 308.) She had lost her alprazolam. (Id.) She was pleasant and cooperative. (Id.) Her diagnoses and medications were unchanged. (Id.)

---

[4]"'Rule out' in a medical record means that the disorder is suspected, but not confirmed, i.e., there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out." **Byes v. Astrue**, 687 F.3d 913, 916 n.3 (8th Cir. 2012).

[5]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

In February 2009, Plaintiff was seen by Stacy A. Bray, Psy.D., at Behavioral Health Care – Rural for an initial assessment. (Id. at 313-15.) Because she was late, only a brief assessment was completed. (Id. at 313.) She described her main problem as being insomnia; she slept between fifteen minutes and two hours. (Id.) She had been taking medications since she was an adolescent, but had been without any for the past month. (Id.) On examination, she had a disheveled appearance, adequate hygiene, normal speech, appropriate behavior, a circumstantial thought process, moderately impaired insight and judgment, intact memory and concentration, fair attention, an anxious mood and affect, and a below average intellect. (Id. at 314.) She was to return to complete the assessment. (Id.) Shortly thereafter, she did return. (Id. at 316-19.) Plaintiff reported having been in two physically abusive relationships. (Id. at 317.) On this examination, she had a casually dressed appearance, an average intellect, and a normal mood and affect. (Id. at 317-18.) Otherwise, she was as before. (Id.) She was diagnosed with PTSD and mood disorder, rule out. (Id. at 318.) Her current GAF was 53-57, as it had been during the past year.[6] (Id.) She was to receive medication management and therapy. (Id.)

In April, Plaintiff consulted Diana Koenig, D.O., to establish care. (Id. at 340, 355-60.) Her medical history included Marfan syndrome, tricuspid regurgitation, fatigue, depression/anxiety, emphysema, and insomnia. (Id. at 340.) Also, she had been in an abusive relationship and had a history of her lungs collapsing. (Id.) Plaintiff was to have lab

_____

[6]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

work done.  (Id.)  The labs came back with elevated liver enzymes; Plaintiff was to be screened for hepatitis.  (Id. at 338.)  She was later diagnosed with hepatitis C.  (Id. at 337, 354.)

On the referral of Dr. Koenig, Plaintiff saw Achenkunju George, M.D., with Cardiology of the Ozarks on May 31.  (Id. at 392-95.)  She reported having palpitations, described as occasional skipped beats that were barely noticeable.  (Id. at 392.)  The symptoms lasted less than one second.  (Id.)  The symptoms also included chest pain or pressure, about which she was not concerned.  (Id.)  She had valvular heart disease, and had been diagnosed with such seventeen years earlier.  (Id.)  The disease was stable.  (Id.)  She had a cough, dyspnea, and frequent wheezing.  (Id.)  She was positive for arthralgias (joint pain), myalgias (muscular pain), anxiety, crying spells, depression, and sadness.  (Id.)  On examination, she was appropriately groomed and in no apparent distress.  (Id. at 394.)  She also had an appropriate affect and demeanor and a normal range of motion.  (Id.)  She had a systolic murmur.  (Id.)  An electrocardiogram was to be performed.  (Id. at 395.)  Plaintiff was urged to quit smoking and continued on her current medications.  (Id.)

Plaintiff saw Dr. Koenig again on June 8.  (Id. at 341, 352.)  She wanted to discontinue taking Cymbalta because it gave her "a 'hazy' feeling.'"  (Id. at 341.)  She reported she had been taking it for situational depression and her circumstances were better.  (Id.)  She had an occasional cough and was diagnosed with bronchitis.  (Id.)  She was told to taper off the Cymbalta.  (Id.)  Her prescriptions for Ambien and Rozerem (for insomnia) were

discontinued because neither was working.  (Id.)  She was prescribed alprazolam, Albuterol, and Advair.  (Id.)

On August 13, Dr. Koenig wrote:  "[Plaintiff] is unable to work due to her health conditions and disabilities."  (Id. at 342.)

Plaintiff saw Dr. Koenig again on September 23.  (Id. at 347, 351.)  She complained of insomnia, for which she had taken several medications to no avail.  (Id. at 347.)  She had gained weight, but was not trying to.  (Id.)  Dr. Koenig's impression was of insomnia, abnormal weight gain, anxiety/depression, and hepatitis C.  (Id.)  She prescribed Remeron for the insomnia and refilled Plaintiff's prescriptions for alprazolam, Albuterol, and Advair. (Id.)

Plaintiff returned to Dr. Koenig on December 29.  (Id. at 346.)  She reported that the Remeron had not helped, and she had stopped taking it in October.  (Id.) She was given a trial prescription of trazodone.  (Id.)

Plaintiff next sought medical attention on April 8, 2010, when she saw Dr. Koenig for refills of her medications.  (Id. at 345, 349-50.)  She complained of coughing and shortness of breath.  (Id. at 345.)  Plaintiff's diagnosis included acute sinusitis and bronchitis, insomnia, and elevated blood pressure.  (Id.)  Plaintiff reported that the trazodone was not effective. (Id.)

On April 22, Plaintiff complained to Dr. Koenig of insomnia and severe depression and anxiety.  (Id. at 344, 348.)  A diagnosis of Cushing's syndrome was to be considered.  (Id.

at 344.)  Dr. Koenig noted that Plaintiff needed to be seen as soon as possible by a psychiatrist.  (Id.)

Plaintiff returned to Behavioral Health Care on April 28 and was seen by Brett Young, P.L.S.W.  (Id. at 320-26.)  Her chief complaint was of "'[i]nsomnia and nerves."  (Id. at 320.) She thought she might be bipolar.  (Id.)  Everyday, she was very nervous, anxious, and depressed.  (Id. at 320-21.)  It was noted that she had a past diagnosis of PTSD, but she did not cite it as a current problem.  (Id. at 321.)  She reported she had not used drugs for nine years, and also reported that she smokes marijuana to help her nerves.  (Id.)  She had been in prison for selling cocaine, but was innocent.  (Id.)  She had not had any past psychiatric hospitalizations.  (Id. at 322.)  She had been in three abusive relationships.  (Id. at 323.)  On examination, Plaintiff was as when seen before at Swope with the exception of having an anxious mood and affect.  (Id. at 324.)  She was diagnosed with panic disorder without agoraphobia; major depressive disorder, recurrent, severe without psychotic features; insomnia related to the first two disorders; polysubstance dependence, sustained full remission; and PTSD, by history.  (Id.)  Her current GAF was 44 to 47.  (Id.)  She was to undergo a psychiatric evaluation and therapy.  (Id. at 326.)

In June, Plaintiff told Dr. Koenig that she was still suffering from insomnia.  (Id. at 343.)  She had slept two hours the night before, and this "was about as good as she [got]." (Id.)  She was taking care of her mother and grandson, who also had Marfan syndrome.  (Id.) She had an appointment the next month with a psychiatrist.  (Id.)  Her prescriptions for alprazolam, Albuterol, and Advair were renewed.  (Id.)  Dr. Koenig recommended she

undergo a sleep study once she had a regimen that helped her to get more sleep consistently. (Id.) She noted that Plaintiff's blood pressure was okay. (Id.)

On July 5, Plaintiff was seen by Elizabeth Hykes, M.S.W., A.C.S.W., L.C.S.W., at Behavioral Health Care. (Id. at 327-28.) Her reported symptoms included labile emotions, tangential speech, and extreme sleep deprivation, unrelieved by previously-prescribed medications. (Id. at 327.) She also reported frequent intense anger or over-reacting to situations. (Id.) She lived with her mother, who was on disability and supported Plaintiff in return for help around the house. (Id.) She was to return in four to eight weeks for continued supportive therapy. (Id. at 328.) Her GAF was 40. (Id.)

Two days later, Plaintiff was seen at Behavioral Health Care by Richard C. Lucas, M.D. (Id. at 329-31.) He rated her current and past GAF as 45. (Id. at 329.) Her chief complaint was of insomnia. (Id.) She had trouble focusing and felt anxious and irritable. (Id.) She worried and could not stop thinking. (Id.) She was depressed. (Id.) She had been hospitalized in 1990 after having a nervous breakdown. (Id. at 329-30.) On examination, she was adequately dressed and groomed and had adequate hygiene. (Id. at 330.) She was "rather restless, fidgety" and had pressured, "hyper verbal" speech. (Id.) Her thoughts were "moderately rambling and tangential"; her affect was "moderately labile"; her mood was anxious; her insight and judgment were fair; her impulse control was adequate; her memory was intact; and her intellect was average. (Id.) She was alert and oriented to time, place, and person. (Id.) Her diagnoses were mood disorder NOS; rule out bipolar and PTSD; history of depression, anxiety, and polysubstance dependence; and insomnia. (Id. at 329.) She was

continued on alprazolam and started on Lamictal and Depakote. (<u>Id.</u> at 331.) She was to return in three to four weeks. (<u>Id.</u>)

Plaintiff went to the emergency room at Ozarks Medical Center on July 22 with reports of having suicidal and homicidal thoughts and of depression. (<u>Id.</u> at 401-04.) She described the onset as "'a long time'" ago, but was not otherwise specific. (<u>Id.</u> at 401.) She had chronic insomnia. (<u>Id.</u>) Plaintiff was voluntarily admitted. (<u>Id.</u> at 405.) She reported that she was not getting any outpatient treatment. (<u>Id.</u>) She used marijuana. (<u>Id.</u>) On examination, she had a fair affect, a stable mood, and fair insight and judgment. (<u>Id.</u> at 406.) She was oriented to time, place, and person. (<u>Id.</u>) She denied any delusions. (<u>Id.</u>) Her memory, both immediate and remote, was intact. (<u>Id.</u>) The diagnosis of the admitting physician, David Fontaine, D.O., was of schizoaffective disorder, bipolar type. (<u>Id.</u> at 407.) Plaintiff's current GAF was 25.[7] (<u>Id.</u>) She was placed on perphenazine (an anti-psychotic) and Pristiq (an antidepressant). (<u>Id.</u>) She was also prescribed doxepin for her insomnia. (<u>Id.</u> at 410.) She informed Richard Aiken, M.D., when seen by him two days later that insomnia was her only issue. (<u>Id.</u> at 408.) He prescribed mirtazapine (the generic form of Remeron) for her to take at bedtime as she was "somewhat obsessing upon her sleep habits." (<u>Id.</u>) The next day, Plaintiff informed Dr. Aiken that she was doing well and had been able to sleep for two hours the night before. (<u>Id.</u> at 409.) She explained that the homicidal thoughts referred to in the emergency room records were those of a grudge against her brother's best friend and

---

[7]A GAF score between 21 and 30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas . . . ." <u>DSM-IV-TR</u> at 34 (emphasis omitted).

that she was "not homicidal per se." (Id.) Nor did she wish to hurt herself. (Id.) His diagnosis was mood disorder, NOS. (Id.) The dosage of mirtazapine was to be increased. (Id.) Plaintiff was discharged on July 30. (Id. at 414.) Her diagnosis was then schizoaffective disorder; her GAF was 40; her prognosis was fair. (Id.)

When Plaintiff next saw Ms. Hykes, on August 24, she was described as being neatly dressed and appropriately groomed, with a "'depressed, frustrated/aggravated, and angry'" mood and affect. (Id. at 462-63.) She had not slept in a week. (Id. at 462.) She had mood swings, problems concentrating, loss of interest in things, racing thoughts, thoughts of trauma, a poor appetite during the day, and eating at night. (Id.) She occasionally used marijuana to help her sleep. (Id.) She reported that she had misused her medications. (Id.) She was disappointed that the medications, including doxepin, prescribed for her in the hospital were not working, as they had been when she was hospitalized. (Id.) Her grandson had returned to live with his mother in Florida. (Id.) She lived with her mother, and had applied for disability. (Id.) Supportive therapy was given. (Id. at 463.)

Two days later, Plaintiff requested pain medication from Dr. Koenig for pain in her feet, back, and legs. (Id. at 478.) She explained that her psychiatrist was familiar with Marfan syndrome and suggested she take stronger pain medication; she was currently taking only Tylenol or Aleve. (Id.) Hydrocodone was prescribed. (Id.) Plaintiff reported that she was taking Seroquel and had been able to sleep the night before for the first time in nine days. (Id.) Dr. Koenig reminded Plaintiff that she needed to see a cardiologist for her annual check-up. (Id.)

Consequently, Plaintiff saw Dr. George again on September 7 for complaints of chest pain that radiated to the neck.  (Id. at 388-91.)  The pain was mild to moderate in intensity and had no identifiable aggravating factors.  (Id. at 388.)  Plaintiff was to have a stress test and an echocardiogram.  (Id. at 391.)

Plaintiff reported to Dr. Lucas when she saw him on September 22 that she was "having increased difficulties with her mood."  (Id. at 458-59.)  She was "moderately labile, dysphoric and pressured with racing thoughts and depressed features."  (Id. at 458.)  His diagnosis was generalized anxiety disorder and bipolar disorder.  (Id.)  Her GAF was 55.  (Id.)  Her dosages of Seroquel and Lamictal were increased; Pristiq was discontinued; Klonopin was continued.  (Id. at 458-59.)

The next day, Plaintiff was seen by Dr. Koenig for a one-month follow-up and was described as "talking non-stop."  (Id. at 477.)  Her hydrocodone prescription was renewed.  (Id.)

Plaintiff informed Dr. Lucas on October 6 that she was "settled a bit more with the increased Seroquel."  (Id. at 460-61.)  She had not been taking the Lamictal.  (Id. at 460.)  She was described as being "generally pleasant, cooperative, engaged.  No hypomania, significant depression, suicidal or homicidal ideation.  Thoughts are clear, coherent, and goal directed."  (Id.)  She was restarted on Lamictal and continued on the other medications.  (Id.)  Her GAF was 50.  (Id.)

On week later, Plaintiff saw Ms. Hykes for supportive therapy.  (Id. at 456-57.)  Her mood was "'irritable, depressed, scattered, frustrated/aggravated, angry, rage, hopeful,

confused, worried, and sad/disappointed.'" (Id. at 456.) She was compliant with her medications. (Id.) She reported getting "a lot of exercise just doing daily routines in the house." (Id.) Her sleep had improved, but she was "unhappy with how emotionally volatile and labile she feels." (Id.) She was encouraged to change her habit of eating meat and cheese before supper and to change the four to five cans of Pepsi she drinks each day to caffeine-free Pepsi. (Id. at 456, 457.) She opposed both suggestions. (Id. at 457.) Her current GAF was 45. (Id.)

On October 27, Plaintiff informed Ms. Hykes that she had reduced the cups of coffee she drank in the morning from two to one and the number of cans of soda with caffeine to three from four or five. (Id. at 454.) She was also reducing her smoking to eight or nine cigarettes a day. (Id.) Even so, she was sleeping only one or two hours a night. (Id.)

Four days later, Plaintiff saw Dr. Lucas, stating that she was a "little more settled" and was not experiencing as many mood swings or increases in depression. (Id. at 452-53.) She was still having problems sleeping. (Id. at 452.) She was pleasant, cooperative, "somewhat restless," and clear and coherent without psychosis. (Id.) Her medications were continued. (Id.) Her diagnosis was bipolar; her GAF was 50 to 55. (Id.)

When next seeing Dr. George, on November 9, Plaintiff reported having had no chest pain since the last visit. (Id. at 384-87.) He noted that the echocardiogram had revealed normal left ventricular size and an ejection fraction of 55 percent; mild aortic regurgitation with normal aortic root size; and mild mitral and tricuspid regurgitation. (Id. at 382-83, 386.) Myocardial perfusion imaging revealed a small area of slightly decreased persistent tracer

uptake in the mid and apical inferior wall region; a normal left ventricular ejection fraction of 67 percent; and no gross wall motion abnormalities of the left ventricle. (Id. at 380-81, 386.) An electrocardiogram revealed a normal sinus rhythm. (Id. at 386.) Plaintiff was advised to continue on her current medications and to call if there was any unusual shortness of breath or abdominal or leg swelling. (Id. at 386.)

The next day, Plaintiff saw Ms. Hykes, reporting increased mood swings and no sleep for three days. (Id. at 450-51.) She felt guilty about being dependent on her mother, although she took care of her mother full-time. (Id. at 450.) Her only social interaction was going to a friend's house or one brother's house. (Id. at 451.) Her GAF was 40. (Id.) Ms. Hykes diagnosed her with PTSD. (Id. at 450.)

Plaintiff reported to Dr. Lucas on December 8 that she was "feeling a bit more settled," and was "generally sleeping through the night." (Id. at 448-49.) She was, however, "waking up somewhat early and having somewhat excessive energy." (Id. at 448.) She was described as "[i]mproving"; continued on her current medications; and assessed as having a GAF of 55-60. (Id.)

On December 21, Plaintiff saw Dr. Koening, requesting refills of her medications and reporting pain in her legs, hand, forearms, and sternum. (Id. at 476.) She further reported that the Seroquel was helping her insomnia and irritability. (Id.) Dr. Koenig renewed Plaintiff's prescription for hydrocodone. (Id.)

Plaintiff reported to Ms. Hykes in January 2011 that she was sleeping "some nights, but rarely all night." (Id. at 446-47.) On February 16, she reported that she had not slept in three days. (Id. at 444-45.)

When seeing Plaintiff on March 7, Dr. Koenig noted that she was talking a lot, but not as much as she had been before starting medications and seeing a psychiatrist. (Id. at 475.) Plaintiff, who was complaining of a cough for the past month, reported that she was getting some sleep. (Id.) Her prescription for hydrocodone was renewed, two other medications were prescribed for the treatment of her cough. (Id.)

Plaintiff saw Dr. Lucas on March 18. (Id. at 442-43.) She was "having significant difficulties with stress in her life," including concerns that her grandson might go into foster care in Florida and attempts to get her mother to agree to have him live with them. (Id. at 442.) She was "moderately tearful and having some difficulty sleeping." (Id.) Although she had "some increased rapid speech," she was "able to settle and be clear, coherent, and goal directed without any significant mania." (Id.) She was "somewhat anxious and mildly dysphoric." (Id.) Her Seroquel dosage was increased; Lamictal, Klonopin, and Ripserdal were prescribed. (Id.) Her diagnosis was bipolar; her GAF was 60. (Id.)

When Ms. Hykes saw Plaintiff on May 6, Plaintiff reported she had moved in with a friend because she was angry with her mother for refusing to allow the child welfare authorities to inspect their house in order for Plaintiff to have custody of her grandson. (Id. at 440-41.) Her sleep was improved, but still not good. (Id. at 440.) As Ms. Hykes did consistently, she diagnosed Plaintiff with PTSD. (Id.) Plaintiff's GAF was 40. (Id. at 441.)

Plaintiff returned to Dr. George on May 18, reporting no specific complaints since she had last seen him. (Id. at 415-18.) She still had occasional chest pain, but the duration and frequency were less. (Id. at 415.) She was diagnosed with mild aortic valve regurgitation and chest pain, "most likely non cardiac in origin." (Id. at 417.) She was overweight, and encouraged to lose weight. (Id.) She was continued on her current medications. (Id. at 418.)

Dr. Koenig renewed Plaintiff's prescription for hydrocodone after seeing her on June 7 for complaints of a recent increase in pain. (Id. at 474.

Plaintiff saw Dr. Lucas again on June 27. (Id. at 438-39.) She reported that she was still having difficulties sleeping, her mind was racing, and she was "feeling somewhat edgy." (Id. at 438.) She was under some stress, but was "managing adequately and safely." (Id.) Her medications were continued; lithium was added. (Id. at 438-39.) Her diagnosis was bipolar. (Id. at 438.)

Plaintiff saw Ms. Hykes on July 13. (Id. at 484-85.) She reported that the lithium was helping, although her family told her she was slurring her speech. (Id. at 484.) She was distressed because her grandson had been placed in foster care and she could not find him. (Id.) Ms. Hykes diagnosed Plaintiff with major depression, recurrent, severe, without psychotic features. (Id.)

On July 22, Plaintiff saw Dr. Koenig to request she complete a disability questionnaire. (Id. at 473.) No medications were prescribed. (Id.)

Also before the ALJ were assessments of Plaintiff's physical and mental residual functional capacities.

In September 2010, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Chrissy Wright, a single decision maker.[8] (Id. at 57-62.) The primary diagnosis was Marfan syndrome; the secondary diagnosis was COPD; other alleged impairments included emphysema and insomnia. (Id. at 57.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and sit, stand, or walk for approximately six hours in an eight-hour workday. (Id. at 58.) Her ability to push and pull was otherwise unlimited. (Id.) She had postural limitations of only occasionally stooping, kneeling, crouching, crawling, and climbing ramps and stairs. (Id. at 59.) She should never climb ladders, ropes, or scaffolds. (Id.) She had no manipulative, visual, or communicative limitations. (Id. at 59-60.) She had environmental limitations of needing to avoid concentrated exposure to hazards, fumes, odors, dusts, and other airborne irritants. (Id. at 61.)

The same month, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Stephen Scher, Ph.D. (Id. at 362-73.) Plaintiff was assessed as having affective disorders, i.e., mood disorder, NOS, and major depressive disorder, recurrent, severe without psychotic features; anxiety-related disorders, i.e., panic disorder without agoraphobia and PTSD; and substance addiction disorders, i.e., polysubstance dependence in sustained full remission and marijuana abuse. (Id. at 362, 365, 366, 368.) These disorders resulted in mild restrictions in her daily living activities, moderate difficulties

<hr>

[8]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (Id. at 370.)  There were no repeated episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. Scher assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two.  (Id. at 374.)  In the area of sustained concentration and persistence, Plaintiff was not moderately limited in one of the eight listed abilities, i.e., the ability to carry out detailed instructions, and was not significantly limited in the other seven.  (Id. at 374-75.)  In the area of social interaction, Plaintiff was moderately limited in two of the five listed abilities:  the ability to interact appropriately with the general public and the ability to accept instructions and respond appropriately to criticism from supervisors.  (Id. at 375.)  She was not significantly limited in the other three abilities.  (Id.)  In the area of adaptation, she was not significantly limited in any of the four abilities.  (Id.)

In June 2011, before the hearing, the ALJ submitted a copy of the exhibits and interrogatories to a medical expert, Joseph Gaeta, M.D., F.A.A.C., F.A.C.P.  (Id. at 424-34.)  He was also asked to complete a Medical Source Statement of Ability to Do Work-Related Activities (Physical) (MSS).  On this form, Dr. Gaeta assessed Plaintiff as having the ability to frequently lift and carry up to twenty pounds and occasionally lift and carry up to fifty pounds.  (Id. at 425.)  She could sit, stand, or walk without interruption for eight hours at one time.  (Id. at 426.)  She did not require the use of a cane.  (Id.)  She had no manipulative,

postural, visual, or hearing limitations. (<u>Id.</u> at 427-28.) She had environmental limitations of being able to only occasionally be exposed to humidity and wetness; dust, odors, fumes, and pulmonary irritants; and extreme cold and heat. (<u>Id.</u> at 429.) On the interrogatories, Dr. Gaeta listed Plaintiff's impairments as aortic insufficiency secondary to Marfan syndrome and COPD, "mentioned but no medical data." (<u>Id.</u> at 432.) These impairments did not meet or equal an impairment described in the Listing of Impairments because (a) there were no symptoms or findings of heart failure, she had a negative stress test, and there were minimal abnormalities on the echocardiogram and (b) there was no evaluation in the record of her COPD. (<u>Id.</u> at 433.)

In July 2011, Plaintiff was evaluated by Jonathan D. Rosenboom, Psy.D., a clinical psychologist. (<u>Id.</u> at 494-98.) Plaintiff was then on three mood stabilizer medications, Lamictal, Seroquel, and lithium, and two anti-anxiety medications, temazepam (the generic form of Restoril) and Klonopin. (<u>Id.</u> at 494.) She complained that she talked a lot, could not stop talking, felt sad, and spent a lot of time in her bedroom. (<u>Id.</u>) She reported she was upset, paced the floors, and had racing thoughts. (<u>Id.</u> at 495.) Her feelings were easily hurt. (<u>Id.</u>) She usually slept for only two hours and once went twenty-two days without sleeping. (<u>Id.</u>) She was under stress because her mother was in the hospital and her daughter and grandson were in Florida. (<u>Id.</u>) She had abstained from marijuana use for the past twelve years. (<u>Id.</u>) She had been in two physically and mentally abusive relationships. (<u>Id.</u> at 496.) She did not have any current flashbacks or nightmares of past traumatic events. (<u>Id.</u>) She had been unemployed for most of her adult life. (<u>Id.</u>) Asked why she was not working or

seeking employment, she explained that "Steve" was taking care of her and did not want her working. (Id.) Also, she had been looking for work, but there was only seasonal work in the town where she lived. (Id.) Asked about any psychological symptoms that affected her ability to work, Plaintiff explained that she had left work before because of stress and did not want to "'go out in the public eye.'" (Id.) She lived with her mother and disabled brother. (Id.) Her mother did the household laundry and cooked. (Id.) She made her bed and watched television. (Id.) On examination, she appeared "moderately anxious." (Id. at 497.) Her eye contact was adequate and appropriate. (Id.) She did not have any facial expressions reflecting inner distress. (Id.) "Her gross motor behavior was moderately jittery and consistent with anxiety although she did not report any anxiety symptoms." (Id.) Her speech "was of increased productivity and was somewhat loud." (Id.) There were no signs of a formal psychotic thought disturbance. (Id.) She was alert and attentive, but was a poor historian and informant about her mental disorder symptoms. (Id.) She denied having periods of extreme elation, but reported frequent irritability episodes and a labile mood. (Id.) She had panic attacks in crowded places. (Id.) She was oriented to person, situation, and time. (Id.) She incorrectly guessed the county in which his office was located. (Id.) Her immediate auditory memory was unimpaired; her delayed auditory recall was moderately impaired by anxiety. (Id.) His diagnosis was Bipolar II Disorder, moderate intensity, most recent episode mixed, in partial remission; panic disorder with agoraphobia, moderate intensity; and cannabis dependence, reportedly in complete and sustained remission. (Id.) Her current GAF was 45. (Id. at 498.)

Dr. Rosenboom completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Plaintiff. (<u>Id.</u> at 491-93.) He assessed her as having a mild to moderate limitation in her ability to understand and remember complex instructions and no limitation in the other five abilities listed for the category of understanding, remembering, and carrying out instructions. (<u>Id.</u> at 491.) Her ability to interact appropriate with the public and to respond appropriately to usual work situations and to changes in a routine work setting were moderately limited. (<u>Id.</u> at 492.) The former was due to her social avoidance; the latter was due to "her high baseline of psychological distress." (<u>Id.</u>) She had no limitations in the other two abilities in the category of interacting appropriately with supervisors, co-workers, and the public. (<u>Id.</u>) No other capabilities were affected by her impairments. (<u>Id.</u>)

As indicated by the ALJ at the conclusion of the hearing, interrogatories were submitted to the VE after Dr. Rosenboom's report was received. (<u>Id.</u> at 213-16.) The interrogatories described a hypothetical claimant who was of Plaintiff's age, had at least a high school education, and had her work experience as a carpet helper. (<u>Id.</u> at 214.) This claimant had the residual functional capacity (RFC) described in Dr. Gaeta's assessment. (<u>Id.</u>) Also, she could perform simple, routine, and repetitive tasks with no required public contact. (<u>Id.</u>) She could tolerate occasional changes in the work setting and occasional interaction with co-workers and supervisors. (<u>Id.</u>) The VE responded that this claimant could not perform Plaintiff's past relevant work, but could perform work as a meat checker, milking machine operator, and bacon skin lifter. (<u>Id.</u> at 214-16.)

In response to the ALJ's inquiry whether Plaintiff wished to submit comments about the answered interrogatories, submit her own interrogatories, or request a supplemental hearing, Plaintiff's counsel requested that a Medical Source Statement – Physical completed for Plaintiff in September 2010 by Diana Koenig, D.O., be forwarded to the VE with the question whether a hypothetical claimant with the described limitations could perform any jobs existing in the national economy and, if so, what jobs. (Id. at 217-18, 220-23.) In the Medical Source Statement, Dr. Koenig assessed Plaintiff as having the ability to frequently lift and carry five pounds; occasionally lift and carry fifteen pounds; continuously stand or walk for less than fifteen minutes; stand or walk for a total of three hours in an eight-hour day; sit continuously for thirty minutes; and sit for a total of four hours in an eight-hour day. (Id. at 222.) Plaintiff needed to avoid pushing and pulling due to her heart problems caused by Marfan syndrome. (Id.) Plaintiff had postural limitations of never climbing and only occasionally balancing, stooping, kneeling, crouching, and crawling. (Id. at 223.) She needed to avoid any exposure to wetness, humidity, dust, fumes, and heights. (Id.) She needed to avoid moderate exposure to weather and hazards and concentrated exposure to extreme cold.[9] (Id.) Because of her pain, Plaintiff would need to lie down once for two hours during an eight-hour day. (Id.) Some of her medications impaired her concentration; her pain impaired her persistence and her concentration. (Id.)

---

[9]There was no choice for not having any limitation.

## The ALJ's Decision

The ALJ first determined that Plaintiff has not engaged in substantial gainful activity since she filed her SSI application in July 2010. (<u>Id.</u> at 12.) The ALJ next found that Plaintiff has severe impairments of aortic valve regurgitation, obesity, Marfan syndrome, COPD, hepatitis C, PTSD, bipolar disorder, and panic disorder. (<u>Id.</u>) She did not have, however, an impairment of combination thereof that met or medically equaled an impairment of listing-level severity, including Listing 3.03 (chronic pulmonary insufficiency), 4.02 (chronic heart failure), 5.05 (chronic liver disease), 12.04 (affective disorders), and 12.06 (anxiety-related disorders). (<u>Id.</u> at 12-14.) With regard to her mental impairments, she had mild restrictions in her activities of daily living; moderate difficulties in social functioning; and moderate difficulties in concentration, persistence, or pace. (<u>Id.</u> at 13.) She had not had any episodes of decompensation of extended duration. (<u>Id.</u>)

The ALJ next found that Plaintiff has the RFC to perform medium work except she could lift and/or carry 21 to 51 pounds occasionally and up to 20 pounds frequently. (<u>Id.</u> at 14.) She could sit, stand, and/or walk for eight hours a day. (<u>Id.</u>) She should only occasionally be exposed to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme could, and extreme heat. (<u>Id.</u>) She could only perform simple, routine, repetitive tasks with no required public contact. (<u>Id.</u>) She could tolerate occasional changes in the work setting and occasional interactions with co-workers and supervisors. (<u>Id.</u>) When assessing Plaintiff's RFC, the ALJ evaluated her credibility. (<u>Id.</u> at 14-17.) She noted that Plaintiff has responded well to surgical intervention and medical management of her Marfan

syndrome.  (<u>Id.</u> at 15.)  She has lung and breathing problems, but continues to smoke cigarettes and marijuana.  (<u>Id.</u>)  She uses inhalers but not oxygen.  (<u>Id.</u>)  Clinical tests, e.g., an electrocardiogram, showed no gross abnormalities.  (<u>Id.</u>)  Her valvular heart disease is currently stable and without associated symptoms.  (<u>Id.</u> at 16.)  Although Plaintiff had "significant stressors in her personal life" and struggled with her sleep and mood, she reported in July 2011 that she was maintaining her household responsibilities and that lithium was helping her.  (<u>Id.</u>)  The ALJ found Plaintiff's activities of daily living to be inconsistent with her reports of being completely disabled.  (<u>Id.</u> at 17.)  Her unemployment was "not completely due to her impairments," but appeared to be more of a personal choice.  (<u>Id.</u>)  She had a poor work history.  (<u>Id.</u>)  Her attendance at only once-a-month individual counseling was inconsistent with someone with significant psychological problems.  (<u>Id.</u>)  And, her treatment was "essentially routine and/or conservative in nature," including her quarterly visits to Dr. Koenig.  (<u>Id.</u>)

The ALJ gave the opinions of Drs. Gaeta and Rosenboom great weight.  (<u>Id.</u> at 18.) The opinion of Dr. Scher was given weight.  (<u>Id.</u>)  The opinions of Dr. Koenig were given little weight in that they were inconsistent with the other medical evidence, with Plaintiff's testimony, and with Dr. Koenig's own treatment records.  (<u>Id.</u> at 18, 19.)  Dr. Koenig's opinion that Plaintiff could not work invaded the province of the Commissioner.  (<u>Id.</u> at 18.)

With her RFC, Plaintiff was unable to perform her past relevant work.  (<u>Id.</u> at 19.) With her RFC, she was able to perform work described by the VE.  (<u>Id.</u> at 20.)  She was not, therefore, disabled within the meaning of the Act.  (<u>Id.</u>)

## Additional Records Before the Appeals Council

With her request to the Appeals Council for review of the ALJ's decision, Plaintiff submitted the office notes of Dr. Lucas for Plaintiff's visits of August 23, 2011; September 20; October 24; and February 7, 2012. (Id. at 504-11.) At the August visit, Plaintiff reported she was feeling more settled and her sleep was improving. (Id. at 510.) Her medications were renewed, with the lithium dosage being increased and the Seroquel dosage being decreased. (Id.) In September, she reported "feeling somewhat improved." (Id. at 508.) In October, however, she was not doing well and was in more pain. (Id. at 506.) She was worried about her disability and was having racing thoughts and more difficulty sleeping. (Id.) She reported she was taking one to two hydrocodone and later "indicated it might be a number more." (Id.) In February, she reported she was "doing fairly well." (Id. at 504.) She was restless but able to cooperate. (Id.) She had "[s]ome mild anxiety," but "[n]o mania or serious depression." (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only

unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford**

**v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).

### Discussion

Plaintiff argues that the ALJ erred when assessing her RFC by (1) failing to follow Social Security Ruling 96-8p, (2) failing to recite the correct RFC found by Dr. Rosenboom, (3) improperly weighing the medical opinions, and (4) improperly rejecting her testimony.

"Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the *least* an individual can do despite his or her limitations, but the *most*." S.S.R. 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996) (footnote omitted). "[S.S.R. 96-8p] cautions that a failure to make the function-by-function assessment could 'result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-8p, 1996 WL 374184, *1).

An ALJ does not, however, fail in her duty to assess a claimant's RFC merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Id.** Instead, an ALJ who specifically addresses the areas in which she found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68.

Plaintiff contends that a limitation found by the ALJ – she should not have required contact with the public – is inconsistent with her findings that Plaintiff has the RFC for occasional interactions with co-workers and supervisors and for occasional changes in the work setting. Plaintiff further argues that the ALJ improperly incorporated in her RFC only one of three limitations found by Dr. Rosenboom. Specifically, the ALJ found Plaintiff was moderately limited in her ability to respond to changes in the work setting, but did not include

her moderate limitations in her ability to respond appropriately to work stressors and to usual work situations.

As noted above, the ALJ gave great weight to Dr. Rosenboom's opinion of Plaintiff's mental RFC.  That opinion included a finding that she was moderately limited in her abilities to (a) interact appropriately with the public and (b) respond appropriately to usual work situations and changes in a routine work setting.  "Moderate" is defined on the form as representing "more than a slight limitation in this area but the individual is still able to function satisfactorily."  (R. at 491.)  The ALJ's limitation of no required contact with the public is arguably more restrictive than Dr. Rosenboom's finding of a moderate limitation, however, the ALJ is not required to either incorporate the entirety of Dr. Rosenboom's opinion or to entirely reject it.  See **Martise v. Astrue**, 641 F.3d 909, 927 (8th Cir. 2011).

Plaintiff argues, however, that the cited inconsistency highlights the failure of the ALJ to provide the required narrative statement supporting each limitation she finds.  In the context of the instant case, Plaintiff's argument is one of style and not of substance.  The ALJ set forth the medical evidence, weighed the opinions and assessments, resolved any conflicts, and described Plaintiff's RFC.  "The ALJ need not provide a narrative discussion immediately following each statement of an individual limitation in the RFC, if the court can otherwise discern the elements of the ALJ's decision-making."  **Jones v. Astrue**, 2011 WL 4445825, *10 (E.D. Mo. Sept. 26, 2011) (citing Depover, 349 F.3d at 567).  See also **Hilgart v. Colvin**, 2013 WL 2250877, *4 (W.D. Mo. May 22, 2013) (finding that a requirement that an ALJ "follow each RFC limitation with a list of specific evidence on which the ALJ relied" to be

inconsistent with the court's duty to base its decision on "all the relevant evidence") (internal quotations omitted).

Nor did the ALJ err by not including in her RFC findings that she was moderately limited in her ability to respond appropriately to work stressors and to usual work situations while including that she was moderately limited in her ability to respond to routine changes in the work setting. These are not, as argued by Plaintiff, three separate limitations found by Dr. Rosenboom. In the report of his evaluation, Dr. Rosenboom concluded, among other things, that Plaintiff was moderately limited in her ability to respond appropriately to work stressors. In his Medical Source Statement, he checked the box for moderate limitations in the one ability of being able to "[r]espond appropriately to usual work situations and to changes in a routine work setting." (R. at 492.) Dr. Rosenboom did not assess Plaintiff as having *three* separate limitations. Therefore, the ALJ's incorporation of a moderate limitation in an ability to respond to routine changes in the work setting is not a rejection of two *other* limitations.

Plaintiff further argues that the ALJ erred by ignoring Dr. Gaeta's failure to consider her obesity – an impairment the ALJ found to be severe – when concluding that she could perform medium work. See S.S.R. 02-01p, 2000 WL 628049, *4 (S.S.A. Sept. 12, 2002) (Obesity is to be considered "a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."). As noted by the Commissioner, Dr. Gaeta reviewed Plaintiff's medical records when assessing her physical

RFC.  Those records consistently include her height and weight.  There is no indication, nor citation by Plaintiff, of any limitation found by Dr. Gaeta that would have been greater had he specifically cited obesity as an impairment.

Plaintiff also argues that the ALJ erred in not giving greater weight to the opinions of her treating physician, Dr. Koenig.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009).  "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted).  Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)).

The first opinion of Dr. Koenig – that Plaintiff was unable to work because of "her health conditions and disabilities," R. at 342 – was rendered four months after Dr. Koenig first saw Plaintiff and after one other visit.  This latter visit was for complaints of situational depression, which Plaintiff described as being better.  The opinion was a one-sentence statement that "'gets no deference because it invades the province of the Commissioner to

make the ultimate disability determination.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (quoting <u>Perkins v. Astrue</u>, 648 F.3d 892, 898 (8th Cir. 2011)).

The second opinion included such limitations as being able to continuously stand or walk for less than fifteen minutes, continuously sit for thirty minutes, stand or walk for a total of three hours in an eight-hour day, and sit for a total of four hours. This opinion was rendered in September 2010, one month after Plaintiff reported pain in her feet, back, and legs, and requested stronger pain medications than the over-the-counter medications she was then taking. The visit before, in April 2010, was for complaints of severe depression, for which Plaintiff was referred to a psychiatrist. Subsequent visits included refills of the pain medication and no repeats of the complaints of pain.

The checklist format of Dr. Koenig's treatment notes do not support the limitations she attributed to Plaintiff. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." **Davidson**, 578 F.3d at 843; <u>accord</u> **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009); **House v. Astrue**, 500 F.3d 741, 744 (8th Cir. 2007). Although the limitations are consistent with Plaintiff's testimony, where, as in the instant case, the claimant is found not to be credible, a treating physician's opinion based on the claimant's subjective complaints may be discounted. <u>See</u> **Renstrom**, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-controlling weight when, among other things, that opinion was largely based on claimant's subjective complaints); **McCoy**, 648 F.3d at 617 (holding ALJ did not err in discrediting mental RFC assessment of neurologist that was based, "at least in part, on

[claimant's] self-reported symptoms" which had been "found to be less than credible");

**Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence).

Plaintiff, however, contends that the ALJ erred when discounting her credibility. The Court disagrees.

"If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011).

When finding Plaintiff not fully credible, the ALJ properly considered the lack of supporting objective evidence, see **id.** (affirming the appropriateness of such consideration), and her sporadic work history, see **Wildman v. Astrue**, 596 F.3d 959, 968-69 (8th Cir. 2010).

Another proper consideration was her leaving work for a reason (the cost of gas) unrelated to her alleged impairments, **Kelley v. Barnhart**, 372 F.3d 958, 961 (8th Cir. 2004), and her remaining off work for reasons unrelated to her alleged impairments (the wish of Steve that she not work and the availability in her town of only seasonal work).

Plaintiff notes that her description of her daily activities supports the credibility of her complaints. That description was given during her hearing testimony. In her Function Report, she described a more active life style. And, she often reported to her various health care providers that she was taking care of her disabled mother, e.g., she reported in July 2010

that she did the housework in exchange for living with her mother and in September 2010 that she was caring for her mother full-time, and of her grandson.

The ALJ also properly considered Plaintiff's noncompliance with medications and treatment recommendations when discounting her credibility. There are references in her medical records to her unilaterally stopping to take a prescribed medication and to misusing her medications. And, although she has emphysema and COPD and has been repeatedly told to stop smoking, Plaintiff continues to smoke tobacco and, apparently, marijuana. "'[F]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.'" **Kisling v. Chater**, 105 F.3d 1255, 1257 (8th Cir. 1997) (quoting Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)). See e.g. **Jones**, 619 F.3d at 971 (finding ALJ had not erred in finding claimant's pulmonary symptomatology had no more than a minimal affect on her ability to work when there was evidence that medication was affective in resolving her wheezing and that she continued to smoke although being told twice to stop smoking).

Because the ALJ's credibility determination is "supported by good reasons and substantial evidence," the Court will deter to that determination. **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013) (internal quotations omitted).

"[T]he burden of persuasion to prove disability and demonstrate RFC [is] on the claimant." **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010). See also **Kamann v. Colvin**, 721 F.3d 945, 950 (8th Cir. 2013) ("Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an

impairment."); **Perkins**, 648 F.3d at 902 ("[T]he ALJ [is] not required to adopt [the claimant's] unsupported subjective complaints and self-imposed limitations.").  Plaintiff has failed to carry her burden of establishing that the ALJ's RFC determination is not supported by substantial evidence on the record as a whole.

### Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'"  **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  19th  day of March, 2014.